CITY OF NEWARK, NEW JERSEY, City of Elizabeth, New Jersey and City of Linden, New Jersey; and the Townships of Hillside, New Jersey and Union, New Jersey, all municipal corporations of the State of New Jersey; Anna Biondi, George W. Reigle, William Panitch, Irving S. Jay, Joseph Spielvogel, Lawrence G. Beisler, and Newark Airport Mayors' Committee, Inc., a corporation of New Jersey, Plaintiffs,

v.

EASTERN AIRLINES, Inc., American Airlines, Inc., Allegheny Airlines, Inc., Mohawk Airlines, Inc., National Airlines, Trans World Airlines, Inc., United Airlines, Inc., the Port of New York Authority, the United States of America, and the Civil Aeronautics Authority, Defendants.

Civ. A. No. 645–54.

United States District Court
D. New Jersey.
Feb. 27, 1958.

752

Van Riper & Belmont, Newark, N. J., by Walter D. Van Riper, Newark N. J., and Richard F. Green, Elizabeth, N. J., for plaintiffs.

Stryker, Tams & Horner, Newark, N. J., by Josiah Stryker, Newark, N. J., for defendant Airlines.

Robert Stern, Chicago, Ill., for United Airlines.

Samuel E. Gates, New York City, and Wm. H. Hagendorn, Brooklyn, N. Y., for American Airlines.

Henry P. Bevans, New York City, for Trans World Airlines.

Russell E. Watson, New Brunswick, N. Y., for Port of N. Y. Authority.

Pitney, Hardin & Ward, Newark, N. J., by Donald B. Kipp, Newark, N. J., for Chamber of Commerce of City of Newark, N. J.

WILLIAM F. SMITH, District Judge.

This is a civil action in which the plaintiffs: the Cities of Newark, Elizabeth and Linden, and the Townships of Hillside and Union, and six individuals, seek to enjoin: first, "the airborne operations of (the named) airlines to and from Newark Airport to the extent that the same constitutes a public and/or a private nuisance," and second, to enjoin "the continued airborne operations of said airlines to and from Newark Airport to the extent that the said constitutes a trespass on the property of the plaintiffs." These prayers for relief are contained in the first and second counts of the amended complaint. There remain as defendants only seven of the twelve air carriers which operate from the Newark Airport, to wit, Eastern Airlines, Inc., American Airlines, Inc., Allegheny Airlines, Inc., National Airlines, Trans World Airlines, Inc., and United Airlines, Inc. The jurisdiction of the Court is based solely on diversity of citizenship.

The first and second counts of the amended complaint assert claims for injunctive relief also against the Port of New York Authority as the lessee and operator of the Newark Airport. These counts were dismissed, on timely motions made by the said defendant, on the ground that they failed to state claims upon which relief could be granted. See Order of Dismissal entered May 19, 1955. We find upon a review of the file, and particularly the jurisdictional allegations of the complaint, that these counts could have been, and should have been, dismissed also because of the absence of diversity of citizenship between the plaintiffs and the said defendant. See Delaware River Joint Toll Bridge Commission v. Stults, D.C.D.N.J.1956, 146 F.Supp. 241, and the cases therein cited, particularly Jacobson v. New York, N. H. & H. R. Co., 1 Cir., 1953, 206 F.2d

153, affirmed per curiam 1954, 347 U.S. 909, 74 S.Ct. 474, 98 L.Ed. 1067. The presence of the Port of New York Authority as a defendant was fatal to the Court's jurisdiction, but since the Port of New York Authority was not an indispensable party, the dismissal of the action as to it cured the defect. The Port of New York Authority was permitted, on timely application, to enter its appearance as an intervenor.

There is included in the amended complaint a third count, which contains a prayer for relief against the Port of New York Authority and the United States of America, to wit, that they, or either of them, be compelled to acquire by condemnation the properties of the plaintiff. These properties are neither identified nor described. The claim for relief therein asserted against the United States of America was dismissed on the consent of the parties. See Order of Dismissal entered January 10, 1955. The claim for relief asserted against the Port of New York Authority was dismissed on a timely motion made by the said defendant. See Order of Dismissal entered December 18, 1957. It should be noted that as to this count, as in the others, there was a lack of jurisdiction in the Court.

The action proceeded to trial only against the defendant airlines, the claim for relief as to the other defendants having been dismissed. The Court perceived before the close of the plaintiffs' case that the general character of the testimony and the manner in which it was presented, assuming a right to injunctive relief, would render compliance with the requirements of Rule 65(d) of the Federal Rules of Civil Procedure, 28 U.S.C.A., difficult, if not impossible. We were of the opinion that a prayer for relief specific in terms, supported by a particularization of the alleged enjoinable operations, was essential if the Court were to comply with the said rule. We, therefore, requested the plaintiffs to file such a prayer for relief supported by an informative particularization of the enjoinable operations of the defendant airlines.

The plaintiffs, in response to the Court's request, filed a "Memorandum of Relief Sought" in which they prayed that the "defendant airlines" be restrained "from operating any of their airplanes over the congested residential sections of Newark, Elizabeth, Hillside and Union at an altitude of less than Twelve Hundred Feet from the Ground." (Emphasis by the Court). The term "congested residential sections" is defined therein as "those locations" in which the witnesses reside. The prayer for relief is admittedly based on the "Noise Abatement Procedures" recommended by the National Air Transport Coordinating Committee, a voluntary group having no official status.

We assume that the only relief now sought by the plaintiffs under the first count of the complaint is that specified in the "Memorandum of Relief Sought." This assumption is predicated not only on the specification embodied in the Memorandum but also on the argument advanced by counsel for the plaintiffs in support of it. (See particularly pages 1415, 1416 and 1417 of the Transcript). Mr. Van Riper, appearing on behalf of the plaintiffs, stated at page 1,417: "So that all that we are asking here—not the closing of the Airport, not to stop them from flying—all we are asking them to do is that they follow the recommendations of their own National Air Transport Committee."

The action is under consideration by the Court at this time on a motion for judgment of dismissal made by the defendants at the close of the plaintiffs' case and renewed after the intervenor, the Port of New York Authority, with permission of the Court, concluded the presentation of some additional evidence. The defendants urge, in addition to other grounds, that the primary and exclusive jurisdiction to grant the relief sought is vested in the Civil Aeronautics Board. It is, therefore, necessary that we consider the prayer for relief in the

light of the regulations promulgated by the Board and the authority of the Board to amend the regulations, should amendment be necessary in the public interest. We must also consider the status of the defendant airlines and the authority under which they operate.

### Defendant Airlines

The defendant airlines are air carriers within the meaning of the Civil Aeronautics Act, and particularly Section 401(2) of Title 49 U.S.C.A., and are engaged in interstate air commerce, as defined in Section 401(20) of the said Title, under the authority of Certificates of Public Convenience and Necessity granted by the Civil Aeronautics Board, pursuant to the authority vested in it by Section 401 of the Act, 49 U.S.C.A. § 481. Each of the defendants is authorized and required by the express terms of its certificate to maintain air transportation service between "the co-terminal points New York, N. Y., and Newark, N. J.," and the intermediate points therein designated. They operate from and to air terminal facilities maintained at the Newark Airport, a public airport classified by the Civil Aeronautics Administrator "as an available and suitable airport for the purposes for which each of the defendants use said airport." See Paragraphs 1, 7, 8 and 9 of the Requests for Admissions, a specimen copy of which is marked D–31 in evidence.

Each of the defendants is the holder of an "Air Carrier Operating Certificate" issued to it by the Civil Aeronautics Administrator, pursuant to the provisions of § 40.10, et seq., of the Civil Air Regulations, 14 C.F.R., and particularly § 40.13, of the said Regulations, 14 C.F.R. Each of the defendants is required by the express terms of the said certificate to conduct "all operations * * * in accordance with the terms and provisions of the Operations Specifications," prescribed by the Civil Aeronautics Administrator, the "Civil Aeronautics Act, and the Civil Air Regulations." These specifications are subject to amendment by the Administrator, pursuant to the authority vested in him by § 40.21 of the Civil Air Regulations, 14 C.F.R.

It should be noted that the Operations Specifications issued to each of the defendants are comprehensive and prescribe in detail, in addition to other conditions, not only the en route limitations but also the procedures to be followed in the take-off and approach patterns. It should be noted further that § 40.10 of the Regulations, supra, prohibits the operation of an airplane "in violation of the terms of an air carrier operating certificate" of which the operations specifications are an integral part. It should be noted also that the operations specifications must conform to the standards prescribed by the pertinent regulations, § 40.10, et seq.

There can be no doubt that the defendant airlines, like all certificated air carriers, are subject to an elaborate and uniform system of regulations and controls. They operate under the authority granted by the Civil Aeronautics Board and are under the obligation to conduct their operations in compliance with the regulations promulgated by the Board under the authority vested in it by the Civil Aeronautics Act. They may operate only under the terms and conditions prescribed by the Civil Aeronautics Administrator and embodied in the operations specifications.

The plaintiffs offered no evidence as to the manner in which the defendants conducted their operations from and to the Newark Airport but agreed to the following stipulations presented by the defendants, to wit, "Each flight to or from Newark Airport by each of the defendant airlines was operated pursuant to the requirement and authorization of one or more certificates of public convenience and necessity issued by the Civil Aeronautics Board. Each flight to and from Newark Airport by each of the defendant airlines was operated in the manner prescribed by the Civil Aeronautics Act, the Civil Air Regulations of the Civil Aeronautics Board, the Air Navigation Regulations of the Civil Aeronautics Administration, and Oper-

ations Specifications annexed to the Air Carriers Operations Certificate issued to said defendant airlines by the Civil Aeronautics Administration." See Pages 1515 and 1516 of the Transcript.

It was further stipulated: "Each flight to or from Newark Airport by the defendant airlines was, while approaching, landing at, taxiing on, taking off from and departing from Newark Airport, under the control of an air traffic controller appointed by the Civil Aeronautics Administration and was operated in accordance with instructions received from such controller." See Page 1516 of the Transcript.

Federal Regulation of Air Commerce

 The enactment of the Civil Aeronautics Act, 49 U.S.C.A. § 401 et seq., was a proper exercise by Congress of the power granted by the Commerce Clause of the Constitution, Article I, Section 8, Clause 3. This legislation clearly evidenced the intent of Congress to preempt the exclusive power of regulation and control in the field of interstate air commerce. There was created thereunder a Civil Aeronautics Board, 49 U.S.C.A. § 421, charged with the responsibility of, and vested with the authority to: first, encourage and develop in the public interest "an air-transportation system properly adapted to the [present and future] needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense"; and second, regulate "air commerce in such manner as to best promote its development and safety." See Declaration of Policy, Section 2 of the Act, 49 U.S.C.A. § 402; see also Section 601 of the Act, 49 U.S.C.A. § 551. The Board was empowered to supervise and control by rule, regulation and order the entire field of interstate air commerce. Section 205 of the Act, 49 U.S.C.A. § 425. It was also made the final arbiter of the public interest.

Section 3 of the Act, 49 U.S.C.A. § 403, provides: "There is recognized and declared to exist in behalf of any citizen of the United States a public right of freedom of transit in air commerce through the navigable airspace of the United States." The term "navigable airspace" is defined in general terms in Section 10 of the Air Commerce Act of 1926, 49 U.S.C.A. § 180, as follows: " * * *, the term 'navigable airspace' means airspace above the minimum safe altitudes of flight prescribed by the Civil Aeronautics Authority, * * *." The term is not otherwise defined by statute, but is defined by regulation.

██ ██ The Civil Aeronautics Board, pursuant to the authority vested in it to prescribe and revise from time to time "air traffic rules governing the flight of * * * aircraft, including rules as to safe altitudes of flight," Section 601(a) (7) of the Act, 49 U.S.C.A. § 551 (a)(7), promulgated §§ 60.17, 14 C.F.R., which prescribed minimum safe altitudes. This rule defined the "navigable airspace" in the manner contemplated by the statutes hereinabove cited.

The pertinent provisions of the applicable regulation read as follows:

"§ 60.17 Minimum safe altitudes. Except when Necessary for Take-Off or Landing, no person shall operate an aircraft below the following altitudes: (Emphasis by the Court).

"(a) Anywhere. An altitude which will permit, in the event of the failure of a power unit, an emergency landing without undue hazard to persons or property on the surface;

"(b) Over congested areas. Over the congested areas of cities, towns or settlements, * * *, an altitude of 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet from the aircraft."

The rule seems to recognize impliedly that in the glide path which must be followed in both take-off and landing, the minimum altitude of 1,000 feet cannot be maintained.

The regulations prescribe not only minimum safe altitudes which are uniformly applicable but also traffic patterns peculiarly applicable to take-off and land-

ing operations for La Guardia, New York International and Newark Airports. These regulations, § 60.18–4, 14 C.F.R., read as follows:

"Operators of aircraft taking off from or landing at La Guardia Airport, New York; New York International (Idlewild) Airport, New York; or Newark Airport, N. J., shall adhere to the following traffic patterns and altitudes made a part thereof, unless otherwise authorized or directed by air traffic control:

"(a) All aircraft shall be operated to follow a standard left-hand rectangular traffic pattern which, for each runway, is contained within a 5-mile radius of the center of the airport.

"(b) Landing aircraft shall be operated so as to join the traffic pattern at or above an altitude of 1,200 feet mean sea level, weather permitting."

It necessarily must be presumed that these rules, like the related air traffic rules, are intended to promote safety of operations in air commerce.

The Civil Aeronautics Board, prompted by a policy statement contained in the Civil Air Policy Report of the Air Coordinating Committee, released by the President under date of May 26, 1954, considered the regulation, § 60.17, supra, and adopted the following interpretation:

"The Board construes the words 'Except when necessary for take-off or landing, no person shall operate an aircraft below the following altitudes' where such words appear in § 60.17 of the Civil Air Regulations, as establishing a minimum altitude rule of specific applicability to aircraft taking-off and landing. It is a rule based on the standard of necessity, and applies during every instant that the airplane climbs after take-off and throughout its approach to land. Since this provision does prescribe a series of minimum altitudes within the meaning of the Act, it follows through the application of section 3, that an aircraft pursuing a normal and necessary flight path incline after take-off or in approaching to land is operating in a navigable airspace." 19 Fed.Reg. 4603, July 27, 1954. See also note following § 60.17, 14 C.F.R.

We are of the opinion that the term "navigable airspace," as thus defined, includes not only the space above the minimum altitude of 1,000 feet prescribed by the regulation but also that space below the fixed altitude and apart from the immediate reaches above the land. The latter limits are not defined with mathematical certainty but by a formula which, as the Civil Aeronautics Board explains, "applies the standard of necessity to accomplish specified ends and in so doing produces the maximum flight paths for climb and descent that are consistent with the safest operating techniques and practices." 19 Fed.Reg. 4602, 4603, July 28, 1954. It has been held that this airspace is in the public domain. United States v. Causby, 1946, 328 U.S. 256, 266, 66 S.Ct. 1062, 90 L.Ed. 1206; Allegheny Airlines v. Village of Cedarhurst, 2 Cir., 1956, 238 F.2d 812, 815; Hinman v. Pacific Air Transport, 9 Cir., 1936, 84 F.2d 755, 758, certiorari denied 1936, 300 U.S. 654, 57 S.Ct. 431, 81 L.Ed. 865.

It was held in the case of Allegheny Airlines v. Village of Cedarhurst, supra, 238 F.2d at page 815: "The foregoing provision contained no suggestion that 'navigable air space' is restricted to air space not less than 1,000 feet above the ground. On the contrary the Congressional purpose is clear to empower the Board to make rules as to safe altitudes of flight at any elevation, since its rules were to have, among other objects, prevention of collisions between aircraft, and between aircraft and land or water vehicles. Obviously the greatest danger of such collisions is when an aircraft takes off or lands. Appellants' argument that the Board has itself established the minimum safe altitude of flight over a congested area, such as Cedarhurst, at 1,000 feet, completely disregards the express exception of take-off and landing stated in the regulation. The federal

regulatory system, if valid, has preempted the field below as well as above 1,000 feet from the ground."

■ It was further stated in the same case, at page 816: "It would be utterly impracticable to attempt to specify by statute the precise height at which a plane could safely take off from or land at an airport, since in each instance decision must depend on many variants, such as weather conditions, character of the terrain, locations of cities and of airports, size and weight of the plane and its cargo, and other relative factors. Such decisions can only be made by some specially equipped administrative agency which can act *ad hoc* to carry out the Congressional policy declared by statute." The problem is peculiarly one for the administrative agency charged with the responsibility and the duty to promulgate and enforce such regulations as may be necessary in the public interest.

■ It follows, if we are correct in our construction of the term "navigable airspace," that the comprehensive authority of the Civil Aeronautics Board to regulate interstate air commerce includes the power to prescribe such air traffic rules as may be necessary to control aircraft flight in the public airspace. This authority includes not only the power to prescribe such air traffic rules as may be necessary to control the en route flight of aircraft in the airspace above the minimum altitude of 1,000 feet but also such power as may be necessary to control the flight of aircraft in the airspace below the fixed altitude and apart from the immediate reaches of the land. It seems obvious that in this field a uniformity of regulation is essential if the maximum standards of safety are to be maintained.

### Primary Jurisdiction

■ The specific prayer for relief advanced by the plaintiff is, as was heretofore stated, that the "defendant airlines" be restrained "from operating any of their airplanes over the congested residential sections of Newark, Elizabeth, Hillside and Union at an altitude of less than 1,200 feet from the ground."

This relief, if granted, would seem to add little, if anything, to the present regulation, § 60.17(b), supra, which requires that aircraft in flight maintain "an altitude of 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet of the aircraft," except in take-off or landing.

If, however, the prayer for relief is directed also to the flight patterns which govern take-off and landing operations at the Newark Airport, these are already controlled by regulation, § 60.18–4, supra, and the procedures prescribed by the Civil Aeronautics Administrator and embodied in the operations specifications issued to each of the defendants. An injunction directed to these flight patterns might well require not only the amendment of the present regulations but also a modification of the said operations specifications. There is clearly no such power vested in the courts.

The plaintiffs do not attack the validity of the present regulations but, if we interpret their prayer for relief correctly, request the Court, by judicial decree: first, to increase the minimum altitude prescribed by § 60.17(b) of the Civil Air Regulations; second, to modify, to the extent that such modification is necessary, the flight patterns established by § 60.18–4; and third, to modify, to the extent that such modification is necessary, the procedures prescribed in the Operations Specifications which accompany the Air Carrier Operating Certificates issued by the Administrator. We are of the opinion that the solution to the questions raised by the prayer for relief, as thus construed, requires the comprehensive knowledge and expertise possessed by the Civil Aeronautics Board. However, if the prayer for relief is narrowly construed as one directed only to § 60.17(b), supra, the conclusion of the Court remains unchanged.

An attempted amendment of the present regulations by the Court, coupled with a modification of the operations specifications, if such modification becomes necessary, would be an unwarranted interference with the regulatory

power vested in the Civil Aeronautics Board and could result only in an unseemly conflict between the administrative agency and the court. If the courts undertook, by judicial decree, to promulgate regulations and establish flight patterns peculiarly applicable to each major airport—and there are one hundred and ninety four—the uniformity contemplated by the Civil Aeronautics Act and essential to a comprehensive regulatory system would soon be impaired. The entire development of the air transportation system would be hampered by a myriad of judicially prescribed regulations of only local application.

We are of the firm opinion that the issues raised by the first count of the complaint, particularly in view of the specific prayer for relief, calls for the application of the doctrine of primary jurisdiction. It is "now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the ·judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure." Far East Conference v. United States, 1951, 342 U.S. 570, 574, 575, 72 S.Ct. 492, 96 L.Ed. 576; See also United States v. Western Pac. R. Co., 1956, 352 U.S. 59, 63, et seq., 77 S.Ct. 161, 165, 1 L.Ed.2d 126; Great Northern Railway Co. v. Merchants Elevator Co., 1922, 259 U.S. 285, 291, 42 S.Ct. 477, 66 L.Ed. 943; Loomis v. Lehigh Valley R. R. Co., 1916,

240 U.S. 43, 50, 36 S.Ct. 228, 60 L.Ed. 517; Texas & Pacific Railway Co. v. Abilene Cotton Oil Co., 1907, 204 U.S. 426, 439, et seq., 27 S.Ct. 350, 51 L.Ed. 553.

If the rapid development of interstate air commerce and the growth of traffic to and from the Newark Airport requires in the public interest the amendment of the present regulations and a modification of the operations specifications held by the defendants, there appears to be adequate authority in both the Civil Aeronautics Board and the Civil Aeronautics Administrator to effect the necessary changes. In fact, the Board is empowered by statute "to conduct such investigations, * * * and to make and amend such general or special rules, regulations, * * *, pursuant to and consistent with the provisions of this chapter, as it shall deem necessary to carry out such provisions and to exercise and perform its powers and duties under this chapter." Section 205(a) of the Act, 49 U.S.C.A. § 425(a). It is clear that under this provision the Board is empowered to initiate and conduct such inquiry as may be necessary to enable it to discharge its functions.

The pertinent provisions of the Civil Aeronautics Act, Section 601 thereof, 49 U.S.C.A., § 551, vests in the Board a comprehensive authority to regulate by rule and order every aspect of interstate air commerce, and specifically empowers it to prescribe and revise from time to time: "Air traffic rules governing the flight of, and for the navigation, * * * of, aircraft, including *rules as to safe altitudes of flight* and rules for the prevention of collisions between aircraft, and between aircraft and land or water vehicles." (Emphasis by the Court.) The authority to prescribe air traffic rules includes also the authority to amend these rules when amendment is necessary in the public interest. This authority is exclusive. The pertinent regulation, § 40.21, 14 C.F.R., vests in the Administrator the power to amend any operations specification "if he finds that safety in air transportation *so re-*

*quires or permits."* (Emphasis by the Court.)

The Civil Aeronautics Board, fully aware of the broad powers vested in it, has by regulation, § 301.40, 14 C.F.R., reserved to "any interested person" the right to "petition the Board for the issuance, amendment, modification, or rescision of any Civil Air Regulation." The pertinent regulations, § 301.41, et seq., prescribe a simple and flexible procedure which may be followed by a petitioner. The rule, as we construe it, reserves to any person whose interests are adversely affected by any regulation, the right to petition for relief. The term "interested person" seems sufficiently broad to include any body politic or municipal corporation.

We are of the opinion that for the reasons herein stated the first count should be dismissed. There appears to be no reason to hold further trial of the litigation in abeyance. If, on petition of the plaintiffs and after investigation and hearing, the Civil Aeronautics Board amends either the present regulations or the operations specifications, or both, a further resort to this Court will be clearly unnecessary.

### Second Count

There are contained in the second count the individual claims of the plaintiffs for damages and for injunctive relief predicated upon an alleged trespass to realty. These claims are jointly pleaded but for the purposes of adjudication must be regarded as separate and distinct claims. The claims present common questions of law and fact of which identical principles are determinative. It might be well, therefore, to first consider these principles.

There no longer can be any doubt that the public enjoys a "right of freedom of transit in air commerce through the navigable airspace of the United States." Section 3 of the Aeronautics Act, supra. The right was recognized by the Supreme Court in the case of United States v. Causby, supra, at pages 260 and 261 of 328 U.S., at page 1065 of 66 S.Ct., wherein it is stated: "It is ancient doctrine that at common law ownership of the land extended to the periphery of the universe—*Cujus est solum ejus est usque ad coelum.* But that doctrine has no place in the modern world. The air is a public highway, as Congress has declared. Were that not true, every transcontinental flight would subject the operator to countless trespass suits. Common sense revolts at the idea. To recognize such private claims to the airspace would clog these highways, seriously interfere with their control and development in the public interest, and transfer into private ownership that to which only the public has a just claim." It was therein held, 328 U.S. at page 266, 66 S.Ct. at page 1068: "The airspace, *apart from the immediate reaches above the land,* is part of the public domain." (Emphasis by the Court.)

It was further held in the Causby case, 328 U.S. at page 264, 66 S.Ct. at page 1067: "The landowner owns at least as much of the space above the ground as he can occupy or use in connection with the land." The Supreme Court cited with approval Hinman v. Pacific Air Transport, supra, in which it was held, at page 758 of 84 F.2d: the landowner owns "so much of the space above the ground as [he] can occupy or make use of, in connection with the enjoyment of [the] land. This right is not fixed. It varies with [the] varying needs and is coextensive with them." The rule, as we interpret it, is that the landowner owns not only as much of the space above the ground as he occupies but also as much thereof as he may use in connection with the land. The airspace which lies above the immediate reaches of his land as thus defined is in the public domain and may be used by the public as navigable airspace. It follows "that the flight of aircraft across the land of another cannot be said to be a trespass without taking into consideration the question of altitude." Hyde v. Somerset Air Service, Ch.1948, 1 N.J.Super. 346, 351, 61 A.2d 645, 648.

The rule as established by the federal courts appears to be consistent with the rule contained in the Uniform Aeronautics Law as enacted by the New Jersey Legislature, R.S. 6:2–6, N.J.S.A., which reads as follows: "Flight in aircraft over the lands and waters of this state is lawful, unless at such a low altitude as to interfere with the then existing use to which the land or water, or the space over the land or water, is put by the owner, or unless so conducted as to be imminently dangerous to persons or property lawfully on the land or the water beneath."

■ The principles do not foreclose the right of the landowner to maintain an action for trespass to realty in a proper case but the action may not rest on evidence that the aircraft in flight passed across his land in the navigable airspace above the immediate reaches thereof. There must be evidence not only that the aircraft passed over his lands from time to time but also that there was an unlawful invasion of the immediate reaches of his land; in other words, there must be evidence that the aircraft flights were at such altitudes as to interfere substantially with the landowner's possession and use of the airspace above the surface.

The evidence offered by the plaintiffs in support of their individual claims must be examined in the light of these recognized principles. When thus examined, the insufficiency of the evidence to support the claims becomes apparent.

### Claims of Municipal Corporations

■ We first direct our attention to the claims for relief asserted under the second count by the City of Elizabeth and the Townships of Hillside and Union. There is evidence that planes in flight passed over these municipalities but the record is completely devoid of any evidence which will support a determination that the planes invaded the immediate reaches of any specific lands of which these municipalities were the owners. This absence of proof is obviously fatal to the individual claims for injunctive relief asserted by these plaintiffs under the second count. Their claims must, therefore, be dismissed.

■ We next direct our attention to the claim of the City of Newark. There is evidence that planes in flight frequently passed over Weequahic High School, a public school of which this plaintiff is the owner. We assume that the claim for trespass to realty asserted by this plaintiff under the second count is predicated on the flight of aircraft over the school. There is no evidence that aircraft in flight passed over any other specific property of which the City of Newark was the owner.

The evidence, considered in the light most favorable to this plaintiff, will not support a claim to relief. The evidence that planes passed over the school will not support an action in trespass in the absence of further proof that flights were at altitudes below the navigable airspace and within the superadjacent reaches above the land; there must be proof that there was an invasion of the latter area. There is no evidence that the flights were at altitudes within the immediate reaches of the said land; in fact, no witnesses attempted even an approximation of the altitudes of the offending planes. We are of the opinion that this lack of proof is fatal to the claim for injunctive relief asserted under the second count.

The evidence is otherwise glaringly deficient. There is no evidence that the planes which passed over the school were those of any one or more of the defendants. Therefore, even if we assume that the evidence is sufficient to support a determination that planes in flight frequently invaded the immediate reaches above the land owned by the said municipality, there is no evidence which will support a determination that the frequent invasions were by the planes owned by any one or more of the defendants, a determination of fact essential to an adjudication that any one or more of the defendants was, or were, guilty of a trespass. The adjudication cannot rest on mere conjecture or speculation.

The claim for injunctive relief asserted by the City of Newark under the second count must, therefore, be dismissed because of the insufficiency of the evidence.

### Claim of the City of Linden

The claim of the City of Linden was heretofore dismissed, after the trial was under way, because of its failure to answer interrogatories propounded by the defendant.

### Claims of Individuals

There were joined as plaintiffs six individuals, four of whom, George W. Reigle, William Panitch, Joseph Spielvogel and Lawrence G. Beisler, offered no evidence in support of the claims asserted by them under the second count. Their claims must, therefore, be dismissed. It should be noted, however, that the claim of the said William Panitch was voluntarily dismissed long before trial. We direct our attention to the remaining claims, that of Anna Biondi and that of Irving S. Jay, each of whom appeared and testified.

### Claim of Anna Biondi

This plaintiff lives at 444 Schiller Street, Elizabeth, N. J., in a house which she occupies with her husband, son and mother. The mother is admittedly the owner of the house, which is located approximately 14,700 feet from the start of the take-off run. She testified generally that planes coming from the airport flew "low" over the house and that she and the members of her family were disturbed by the noise and vibration. She further testified that it was necessary to replace two ceilings in the house, but there was no evidence which would support a determination that there was any causal relation between the damage to the ceiling and the flight of aircraft over the house.

Neither this plaintiff, nor any witness on her behalf, ventured an approximation of the altitudes at which planes passed over the house. There is clearly no evidence which will support a determination that aircraft passed below the navigable airspace and within the immediate reaches of the land. The lack of such evidence is fatal to the claim for relief.

We find in the case of this plaintiff, as in the case of the City of Newark, an additional deficiency in the evidence. Even if we assume that there was a trespass over the lands, there is no evidence which will support a determination that the defendant airlines were the ones guilty. There is no evidence which will enable the Court to establish the identity of the offenders. What has been said concerning the claim of the City of Newark is equally applicable to the claim of this plaintiff.

It further appears that this plaintiff lacks the possessory interest in the land sufficient to qualify her to maintain her claim under the second count. The plaintiff is an occupant of the property, but with her mother, who is admittedly the owner thereof; it would appear from her testimony that the plaintiff is neither the owner nor a tenant in exclusive possession of the property. It follows that the cause of action under the second count, based upon a trespass to realty, could have been asserted only by the mother. It appears that she is the real party in interest.

The claim for injunctive relief asserted by this plaintiff under the second count must be dismissed for the reasons herein stated.

### Claim of Irving S. Jay

This plaintiff lives at 333 Itaska Street, Hillside, N. J., in a house which is more than three and a half miles from the start of the take-off run. He testified generally that he and the members of his family were, and are, disturbed by the noise and vibration caused by planes which pass over his house.

He was asked, "Will you tell us just what happened and what you saw?" He answered: "Yes. During the period that I am home I noticed that there are anywhere from thirty to fifty planes until one o'clock in the morning, that is, the period from six o'clock at night to one

o'clock in the morning. Some near, some far, some very, very close. These planes come over, both coming from the Airport and going to the Airport. They come over with a terrible roar; they come over, they shake the house; they have caused cracks in the ceiling, they have caused the dishes to jingle in the cupboard, they have caused us to wake up at night. They disturb my sleep and my family's sleep." (Page 351 of the Transcript). When asked as to the identity of the planes, he answered: "American, Eastern, TWA and several others like that." When pressed further, he added: "United," and "Mohawk." (Page 353 of Transcript). It appears from his testimony that these identifications were made during the summer months. When asked, "how many of the planes that come over from 6 P.M., to 8 A.M., did you identify?", apparently referring to observations made by the plaintiff during the winter months, he answered, "I couldn't identify any." The testimony was otherwise so indefinite that it would be impossible for the Court to determine with any reasonable degree of certainty the frequency with which any one or more of the aircraft of any one or more of the defendant airlines passed over the property of the plaintiff.

A deficiency of evidence, common to the claims of the other plaintiffs, is present here. A careful examination of the plaintiff's testimony discloses that he did not venture an approximation of the altitudes at which planes crossed his property. There is clearly no evidence which will support a determination that aircraft passed below the navigable airspace and within the immediate reaches of the land, a determination of fact which is necessary if the Court is to adjudge any one or more of the defendants guilty of a trespass to realty.

We do not mean to suggest that the plaintiff must prove with mathematical exactitude the altitudes at which aircraft ordinarily passed over his property; this might very well be an impossible task. There must be some evidence, however, which will enable the Court to make a determination that the aircraft flights were at altitudes below the navigable airspace, which is in the public domain, and within the superadjacent airspace immediately above the land. The ultimate determination must be predicated upon a consideration of aircraft altitudes, and therefore some evidence as to altitudes, for example, well-grounded approximations, is necessary. A determination that there has been a continuing trespass may not rest on mere speculation and conjecture.

The claim for injunctive relief asserted by this plaintiff under the second count must, therefore, be dismissed because of the insufficiency of the evidence.

### Claims for Damages

There is asserted by each of the plaintiffs a claim for damages. These claims are stated in the second count. There is clearly no evidence to support the claims for damages asserted by the municipalities and, therefore, their claims must be dismissed. The dismissal of these claims for damages may be sustained also on the ground heretofore discussed, to wit, the insufficiency of the evidence to support the charge of trespass to realty.

The claim asserted by the plaintiff Anna Biondi must be dismissed because, as heretofore held, she is not the real party in interest; she is neither the owner of the property nor a person with an exclusive possessory interest therein, and for this reason may not maintain an action in trespass.

The claim for damages here made by the plaintiff Irving S. Jay rests on rather tenuous evidence but must be dismissed because of the lack of jurisdiction and not on the merits. This plaintiff testified that the walls of his home were cracked but offered no other evidence of damage. Therefore, even if we assume that any one or more of the defendant airlines is answerable in damages, we are satisfied from the testimony that the amount of the claim does not exceed $3,000 exclusive of interests and costs. The jurisdictional requirements

established by statute, 28 U.S.C.A. § 1332(a)(2) are absent.

The defendants shall prepare and submit to the Court, on notice to the plaintiffs, an appropriate order of dismissal.