AMERICAN AIRLINES, INC., et al., the Port of New York Authority and Charles H. Ruby, et al., Plaintiffs-Appellees,

and

The Administrator of the Federal Aviation Agency, Intervenor-Appellee,

v.

TOWN OF HEMPSTEAD et al., Defendants-Appellants.

No. 450, Docket 31790.

United States Court of Appeals Second Circuit.

Argued June 13, 1968.

Decided July 17, 1968.

———◆———

Fowler Hamilton, New York City (Lyman M. Tondel, Jr., George Weisz, James D. Wiese, and Cleary, Gottlieb, Steen & Hamilton, New York City, on the brief), for plaintiffs-appellees American Airlines, Inc., and others.

Daniel B. Goldberg, New York City (Joseph Lesser, Isobel E. Muirhead, and Sidney Goldstein, New York City, on the brief), for plaintiff-appellee The Port of New York Authority.

Samuel J. Cohen, New York City (Bruce H. Simon, and Cohen & Weiss, New York City, on the brief), for plaintiffs-appellees Charles H. Ruby, and others.

Howard E. Levitt, Hempstead, N. Y. (Robert M. Foley, Hempstead, N. Y., on the brief), for defendants-appellants.

Norman G. Knopf, Atty., Dept. of Justice, Washington, D. C. (Edwin L. Weisl, Jr., Asst. Atty. Gen. and John C. Eldridge, Atty., Dept. of Justice, Washington, D. C.; Joseph P. Hoey, U. S. Atty. for the Eastern District of New York, on the brief), for intervenor-appellee.

Before SMITH, KAUFMAN and HAYS, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

The Town of Hempstead appeals under 28 U.S.C. § 1292(a) (1) from an order of the District Court for the Eastern District of New York, John F. Dooling, Jr., Judge, granting a preliminary injunction against enforcement of its Unnecessary Noise Ordinance (No. 25), Article II, as amended March 10, 1964, so far as it applies to aircraft using John F. Kennedy International Airport. Judge Dooling's opinion appears at 272 F.Supp. 226.

Since the District Court's complete and precise findings of fact (see appellant's appendix, pp. 200a–264a) as to a great number of technical matters are not being attacked on this appeal, a short statement of the facts may suffice. The Town of Hempstead, primarily residential, is the largest town in New York State, with an estimated population in 1963 of nearly 806,000. It lies to the east of John F. Kennedy International Airport ("JFK"), and it is estimated that 150,000 people live in its incorporated villages which lie within three miles of the Airport. These people share with many others, inside and outside Hempstead and across the country, a severe aircraft noise problem which has developed in the years since the Second World War. As the District Court said:

> In the years since 1948 * * * turbo and fan jet aircraft have all but displaced turbo and piston driven propeller craft. Larger, heavier and faster than propeller craft, the jets have demanded lengthened runways, and exacted new constants of air traffic management. * * * [T]he inverted truncated cone of air space resting on the airport, that can be thought of as representing the zone marked by the jets' landing glide slopes of about three degrees, was far nearer the edges of the airport and closer down on the bordering communities. It was as if every existing propeller craft runway had been suddenly moved out toward the boundary of the airport. * * * [T]he impact on the surrounding communities was marked and unhappy. 272 F.Supp. at 228–229.

Because of the frequency with which jets fly in and out of JFK, the problem in Hempstead may be somewhat worse than in other communities. The District Court found that:

> There is credible evidence that the noise of an aircraft overflight in Hempstead is frequently intense enough to interrupt sleep, conversation and the conduct of religious services, and to submerge for the duration of the maximum noise part of the overflight the sound of radio, phonograph and television. (Finding #127)

> There is credible evidence that the noise of an aircraft overflight in Hempstead is frequently intense enough to interrupt classroom activities in schools and to be a source of discomfort to the ill and distraction to the well. (Finding #128)

> It is a fair inference from the affidavits, the demonstration [in the courtroom] of the sound levels recorded in the Town and the evidence of frequency of overflights that airplane noise is a factor of moment affecting the decisions of people to acquire or dispose of interests in real property in the areas within the Town affected by the sound of airplane overflights. (Finding #129)

In an attempt to deal with the problem, the Town added a new article to its Unnecessary Noise Ordinance, forbidding anyone from operating a mechanism or device (including airplanes) which creates a noise within the Town exceeding either of two "limiting noise spectra." Claiming that the ordinance would prohibit airplanes using JFK from flying over the town, and thus would restrict the landing and take-off patterns and procedures normally adhered to by those airplanes, nine major American-flag air carriers, The Port of New York Authority, Charles H. Ruby as president of the Air Line Pilots Association, three air line pilots, individually and as representatives of their class, and the Administrator of the Federal Aviation Agency (as intervenor) sued to enjoin the enforcement of the ordinance against them.

The Town argued initially that aircraft could fly over the Town in compliance both with the ordinance and with the FAA regulations governing landing and take-off patterns and procedures. There was no question, however, but that at the time the suit was brought, take-offs and landings at JFK regularly produced noise exceeding the relevant limiting noise spectrum of the ordinance.

The District Court made crucial findings of fact which contradict the Town's

initial argument that compliance with the ordinance is possible without alterations in flight patterns and procedures, and the Town has now shifted its ground, arguing in essence that the ordinance is not an undue burden on interstate commerce, because "the Town has unveiled a plan pursuant to which approximately 98% of all flights [to and from JFK] will avoid the Town while, at the same time, the present traffic capacity will be unaffected." (Town's brief, p. 22).

The crucial findings of fact are Nos. 281–294.[1] The court found that compli-

281. The Town of Hempstead intends to enforce the Amended Ordinance and has counterclaimed for an injunction against plaintiffs' violation of the Ordinance.

282. Compliance with the Hempstead Ordinance's regulation of noise production and duration would be determinative of the altitudes at which and the flight paths by which commercial aircraft could operate into and out of Kennedy Airport on take-offs and landing approaches, and would exclude them from paths that traverse Hempstead when conducted in accordance with existing traffic patterns and airport and FAA procedures, and the flight requirements flowing from the Ordinance would be in large part incompatible with the existing traffic patterns and FAA procedures.

283. The altitudes and flight paths which the Ordinance would require commercial aircraft to use in order to comply, would directly conflict with the altitudes and flight paths now established for commercial aircraft under existing FAA regulation of air traffic at Kennedy Airport.

284. Compliance with the Hempstead Ordinance would require a redesigning by the FAA of the present set of SIDs and landing approaches for Kennedy Airport, and integrating the redesigned procedures with the related procedures at the other Metropolitan Airports; it could not preserve the safety margins of the existing procedures without restricting the traffic handling capacity of Kennedy Airport.

285. The combination of the physical facts of wind and weather conditions, the FAA air traffic regulations and enforcement of the Hempstead Ordinance would radically reduce the availability of Kennedy Airport for air transportation.

286. There is no reliable evidence that a set of procedures could be devised for Kennedy Airport in the present state of aviation development which could without substantial sacrifice of the interest in flight safety assure either practical or complete compliance with the Hempstead Ordinance.

287. The radical reduction of the capacity of Kennedy Airport to handle scheduled commercial aviation which would result from the enforcement of the Hempstead Ordinance would cause very great economic loss to each of the plaintiffs herein, and in consequence, to the metropolitan New York community.

288. It is a fair inference from the evidence at this stage of the case that there is a substantial risk that enforcement of the Ordinance would result in some of the commercial airlines' withdrawing some or all of their scheduled operations from Kennedy Airport, and if any substantial part of that traffic were lost, Kennedy Airport would no longer be a viable economic operation for the Port Authority.

289. No other airport, or combination of airports, in the metropolitan New York area could handle the passenger and cargo traffic presently handled at Kennedy Airport, and substantial restriction of the area traffic handled through Kennedy Airport would, until new facilities were created, curtail the air transport of the area.

290. The interstate and foreign commerce presently conducted at and through Kennedy Airport is an essential and integral part of this country's system of air commerce.

291. Continued commercial operation of Kennedy Airport at capacity is integral to the free flow of interstate and foreign commerce, and the enforcement of the Hempstead Ordinance with its constriction of the ability to make optimum use of Kennedy Airport would seriously burden the conduct of such commerce.

292. Enforced compliance with the noise criteria of the amended Hempstead Ordinance during the continuance of the present litigation will irreparably injure the plaintiff airlines, the Port Authority, and the airline pilots through curtailing the use of Kennedy Airport and jeopardizing its continuance as the primary intercontinental airport of the Metropolitan area.

293. Disregard, until final adjudication, of the limitations imposed by the noise criteria of the amended Ordinance exposes to repeated prosecution each person who operates an airplane or causes one to be operated which creates in

ance with the ordinance would be determinative of the altitudes at which and flight paths by which commercial aircraft could fly into and out of JFK; that the flight requirements flowing from the ordinance would be in large part incompatible with existing traffic patterns and FAA procedures; that compliance would mean redesigning of the flight patterns for JFK, together with a reintegration of the redesigned patterns with those for the other New York City airports, and that the safety margins of the existing procedures could not be preserved without restricting the traffic handling capacity of JFK; and that there is no reliable evidence that a set of procedures could be devised for JFK in the present state of aviation development which could, without substantial sacrifice of the interest in flight safety, assure compliance with the ordinance. None of these findings have been attacked on this appeal, except that the Town still insists that its alternate plan, submitted to the District Court, could steer most flights away from the Town, thus assuring compliance with the ordinance. Apart from the lack of a showing that the District Court's finding to the contrary is clearly erroneous, it is clear that given the necessary determination of the legal issues in the case, the Town's alternate plan, even if it *were* feasible, would be irrelevant.

On the basis of his detailed and thorough findings of fact, Judge Dooling concluded: (1) that the ordinance is an unconstitutional burden on interstate commerce; (2) that the area in which the ordinance operates has been preempted by federal legislation and regulation; and (3) that the ordinance is in direct conflict with valid applicable federal regulation.

■ Any one of the District Court's three conclusions is enough, of course, to make the ordinance invalid. There is no need for determination of the validity of the first two grounds, since the third ground for the ordinance's invalidity (that it is in conflict with applicable federal regulation) is an ample basis for affirmance. In Loma Portal Civic Club v. American Airlines, Inc., 61 Cal.2d 582, 39 Cal.Rptr. 708, 394 P.2d 548 (1964), the California Supreme Court affirmed a refusal to enjoin flight operations at a public airport at the behest of the owner of property in the neighborhood of the airport, basing its decision on the narrow ground that it is clearly against the policy of the State of California for its courts to interfere with airport flight patterns which are established by federal regulation. The court explicitly refused to accept an argument that the regulation of aviation has been pre-empted by federal legislation and regulation; indeed, the opinion indicated that the court thought there was no pre-emption.

Before considering the grounds advanced by the District Court for the conclusion that the ordinance is invalid, we may point out that this case has nothing to do with questions of landowners' rights to compensation for overflights of their land which amount to a "taking" of their property. [See United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), and Griggs v. Allegheny County, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962).] All that is involved is the validity of the ordinance.

We consider first the point that the ordinance is in direct conflict with a valid applicable federal regulation. The Federal Aviation Act of 1958 provides, *inter alia:*

There is recognized and declared to exist in behalf of any citizen of the United States a public right of freedom of transit through the navigable airspace of the United States. [49 U.S.C. § 1304]

Hempstead a noise exceeding the limiting noise spectra of the Ordinance.

294. The disadvantage to the inhabitants of the defendant Town from continuance of the operation of Kennedy Airport on substantially the present basis is outweighed by the advantages to the total social interest, including that of the inhabitants of the Town in the continued operation of Kennedy Airport in its present legal Framework.

The Administrator is authorized and directed to develop plans for and formulate policy with respect to the use of the navigable airspace; and assign by rule, regulation, or order the use of the navigable airspace under such terms, conditions, and limitations as he may deem necessary in order to insure the safety of aircraft and the efficient utilization of such airspace. * * * [49 U.S.C. § 1348(a)]

The Administrator is further authorized and directed to prescribe air traffic rules and regulations governing the flight of aircraft, for the navigation, protection, and identification of aircraft, for the protection of persons and property on the ground, and for the efficient utilization of the navigable airspace, including rules as to safe altitudes of flight and rules for the prevention of collision * * *. [49 U.S.C. § 1348(c)]

As Judge Dooling found, the Administrator (Administrator of the Federal Aviation Agency, see 49 U.S.C. § 1301(1)) has promulgated extensive regulations under the Act, which unquestionably control the patterns and procedures of aircraft flying into and out of JFK.[2] The

2. See Findings Nos. 67-104, as follows:

67. The Administrator has established an extensive system of electronic navigational aids and a network of Federal Airways and Jet Routes surrounded by controlled airspace for aircraft operating within the air traffic control system. The Federal Airways are eight miles wide and extend from one navigational aid (or intersection) to another such aid (or intersection); Federal Airways have a floor of 700 feet mean sea level ("MSL") and a ceiling at 18,000 feet. The airspace within these Federal Airways is designated as control areas, except the portions above 14,500 feet MSL. Those portions lie within the Continental Control Area that encompasses all airspace of the United States between 14,500 feet MSL and 45,000 feet MSL.

68. The Jet Routes, also eight miles wide, are between 18,000 feet MSL and 45,000 feet MSL. They are within the Continental Control Area. The higher altitudes where most Jet Route operation occurs, are within the Positive Control Area, i. e., the airspace between 24,000 feet MSL and 60,000 feet MSL where all operations are under positive control.

69. The networks of Federal Airways and Jet Routes converge upon holding patterns or gates through which aircraft pass and from which they are vectored by "Air Traffic Control" over designated courses and at specified altitudes to the points from which they execute their approach for landing at the airport.

70. "Air Traffic Control" means a service operated by appropriate authority to promote the safe, orderly, and expeditious flow of air traffic.

71. Control over the aircraft within the Kennedy Airport control zone and within certain portions of the adjacent area is. exercised by Federal Aviation Agency Airport Traffic Control Tower personnel located at the airport.

72. The Federal Aviation Air Traffic Control personnel at the Air Route Traffic Control Center at Islip, Long Island, New York, exercise control throughout the rest of the New York Area over aircraft operating under Instrument Flight Plans. These facilities are operated on a 24-hour basis, 7 days a week.

73. To provide separation between aircraft under its control, Air Traffic Control assigns altitudes for holding at the gates from which aircraft are vectored to points of landing approach, or holding patterns, and for operating on the Federal Airways and Jet Routes.

74. The Administrator has established a system for the control of air. traffic which provides for separation, and which operates within defined airspace identified as "control zones" and "control areas."

75. The airspace within a "control zone" below an altitude of $2,000 feet above the surface, and within a horizontal radius of five statute miles from the geographical center of any airport, is designated as the "airport traffic area" (FAR 1.1). Unless otherwise authorized by Air Traffic Control, a pilot operating within an airport traffic area must maintain two-way radio communication with the control tower (FAR 91-87(b)). The pilot, whether operating in a control zone or area, is required to comply with any instructions that may be issued by Air Traffic Control [FAR 91.75(b)].

76. "Control zones" encompass all of the airspace from the surface to infinity, within five miles of the geographical center of an airport. The control areas are of varying elevations and dimensions. Part of the Town of Hempstead lies within the control zone of Kennedy Air-

ordinance and these regulations are unquestionably in direct conflict. They are in conflict not because the regulations and the ordinance impose different stand-

port. The remainder of the Town lies beneath a control area which extends from 700 feet above the surface to 14,500 feet MSL.

77. The rules established by the FAA for the control of air traffic are broadly separated into Visual Flight Rules (VFR) and Instrument Flight Rules (IFR) (FAR, Part 91).

78. Flight pursuant to IFR is required when weather conditions do not meet specified minima of ceiling and visibility (FAR §§ 1.1, 91.105, 91.107).

79. When the specified minima of ceiling and visibility are met, flights may be conducted pursuant to VFR (FAR §§ 91.105, 91.107).

80. Whether their operations are conducted pursuant to IFR or VFR, flights through any airspace subject to federal control are obliged to obey all instructions given by the Air Traffic Control service of the FAA (FAR §§ 91.75(b), 91.85, 91.87).

81. The Air Traffic Control service of the FAA maintains control over en route aircraft by radio communication from control Centers across the nation.

82. The Continental United States is divided into numerous such Centers, each of which is subdivided into sectors, and aircraft are relayed from one Center to the next in their flights across country.

83. The Air Traffic Control Center for the New York Center is located in Islip, New York.

84. The pilot and his aircraft while under the surveillance and jurisdiction of the Air Traffic Control personnel at Islip or Kennedy Airport are required to conform with all the prescribed procedures (FAR § 91.115).

85. IFR flights descending from the gates or holding patterns on which the Federal Airways converge are provided separation from other aircraft under Air Traffic Control.

86. No person may operate an aircraft in controlled air space under Instrument Flight Rules unless he has received an appropriate Air Trafic Control clearance (FAR § 91.115(b)).

87. "Air traffic clearance" means an authorization by Air Traffic Control, for the purpose of preventing a collision between known aircraft, for an aircraft to proceed under specified traffic conditions within controlled airspace (FAR § 1.1).

88. Compliance with air traffic control clearances is required by Federal Aviation Regulations [FAR § 91.75(a)].

89. At an airport with an operating control tower, no pilot may taxi an aircraft on a runway, or take-off or land an aircraft unless he has received an appropriate clearance from Air Traffic Control [FAR § 91.87(h)].

90. No person may, in general, deviate from an air traffic control instruction in an area in which air traffic control is exercised (FAR § 91.75); however, the procedures and regulations recognize that in a given instance, where he deems it necessary for the safety of flight the pilot may deviate from such procedures or regulations (FAR §§ 91.3, 91.75).

91. No person may operate a civil aircraft in Instrument Flight Rule Conditions unless the aircraft carries enough fuel (considering weather reports and forecasts, and weather conditions) to complete the flight to the first intended point of landing, to fly from that point to the alternate airport, and to fly thereafter for 45 minutes at normal cruising speed (FAR § 91.23).

92. When an instrument letdown to an airport is necessary, the aircraft must use a standard instrument approach procedure prescribed by the Administrator for that airport [FAR § 91.117(a)].

93. The Administrator has promulgated rules governing the operation of aircraft outside as well as within controlled airspace (e. g., FAR §§ 91.67, 91.79). For example, Federal Aviation Regulations prohibit the operation of an aircraft in a careless or reckless manner so as to endanger the life and property of another (FAR § 91.9).

94. Unless otherwise authorized by Air Traffic Control:

a. Turbine-powered aircraft must maintain, within the airport traffic area, an altitude of a least 1,500 feet above the surface of the airport until further descent is required for safe landing [FAR § 91.87(d) (1)];

b. Large aircraft approaching to land on a runway served by an Instrument Landing System (ILS) must, if the aircraft is ILS equipped, operate the aircraft at or above the glide slope between the Outer Marker and the Middle Marker [FAR § 91.87(d) (2)];

c. An airplane approaching to land on a runway served by a visual approach slope indicator, must maintain an altitude at or above the glide slope until a lower altitude is necessary for safe landing [FAR § 91.87(d) (3)];

d. An aircraft approaching to land at an airport served by a tower must circle

ards for noise, but because the District Court has found, in view of the present state of development of noise suppression techniques, that compliance with the noise ordinance would require alterations in the flight patterns and procedures established by federal regulation.

In Allegheny Airlines, Inc. v. Village of Cedarhurst, 238 F.2d 812 (2 Cir. 1956), this court relied on the provisions of the Civil Aeronautics Act of 1938, which are somewhat less comprehensive than the provisions of the 1958 Act quoted above, to declare invalid an ordinance which prohibited air flights over the

Village of Cedarhurst at altitudes of less than 1,000 feet. The opinion can be read either as a holding that the entire field of regulation of aircraft flight has been pre-empted by the federal government, or as a holding that the particular ordinance involved was in conflict with the federal regulatory scheme. In Loma Portal Civic Club v. American Airlines, Inc., supra, the California Supreme Court chose the narrower reading of the Cedarhurst case. Whichever reading is accepted it is clear that Cedarhurst is square precedent for holding the Hempstead ordinance invalid, for in effect there is square conflict between the local ordi-

the airport to the left [FAR § 91.87(e) (1)];

e. An aircraft taking-off from an airport with an operating control tower must comply with any departure procedure established at that airport by the FAA [FAR § 91.87(f) (1)];

f. When landing or taking-off from an airport with an operating tower and for which a preferential runway system has been established by the FAA, a large aircraft, assigned a preferential runway by Air Traffic Control, must use that runway [FAR 91.87(g)];

g. Large aircraft approaching for landing at John F. Kennedy International Airport are required to maintain an altitude of at least 1,500 feet above the surface so long as practicable (FAR § 93.33; 14 CFR § 93.33); and

h. Departing aircraft are required to climb to an altitude of 1,500 feet as rapidly as practicable (FAR § 91.87(f)).

95. Pursuant to Title VI of the Act (promotion of safety of flight by prescribing and revising standards, rules and regulations) the Administrator has promulgated rules and regulations governing the operation and maintenance of aircraft (FAR Parts 43, 91), the certification of airmen (FAR Part 61), the issuance of type certificates (FAR Part 21), the issuance of and standards for airworthiness certificates (FAR Part 21, Sub-part H) and the issuance and use of air carrier operating certificates (FAR Part 121).

96. Every aircraft manufacturer prepares an operating manual for each model of aircraft produced and these manuals, if approved by the FAA after inspection and testing of the aircraft, set forth the maximum demonstrated performance limits of the aircraft.

97. The manufacturer's manual must contain all the certificate limitations of

the aircraft and performance data necessary for operation, including required techniques for operation such as those needed for normal take-off and landing, emergencies, obstacle take-off and climb-out, maximum climb angles, degree of allowable bank on turning and crosswind operations.

98. Such airplane flight manuals contain all the data respecting the critical performances of the airplane, and set forth the information needed to achieve the minimum acceptable level of safety in operating the airplane in an emergency.

99. A copy of the appropriate manual for its model is required by regulation to be carried aboard each and every aircraft.

100. Each commercial airline, pursuant to regulation, prepares its own operating or flight manuals directly from the FAA approved manufacturer's manuals.

101. The manuals are, under the regulations, binding upon all flight personnel; they contain operating procedures and techniques for the entire operation of the aircraft, and include FAA route maps, navigational charts and approach and departure patterns.

102. Each such manual prepared by an air carrier reproduces the certificate limitations and performance data sections of the FAA approved manufacturer's manual without change except in format.

103. When the material required by federal regulation is included, the airline's manual may be substituted for the FAA approved manufacturer's manual aboard an aircraft.

104. Operating manuals prepared by any air carrier for use of its personnel must be approved by the FAA upon its publication and all alterations, amendments or revisions must also be approved by the FAA.

nance and federal regulation in each case; indeed, the Hempstead ordinance is in effect a more comprehensive regulation of air traffic patterns than was the Cedarhurst ordinance. (For one thing, it would bar flights at altitudes much higher than 1,000 feet; see, e. g., Finding No. 199:[3] the vast majority of commercial jet aircraft could comply with the ordinance on take-off from JFK only by flying over the Town at minimum altitudes ranging from 5,050 to 14,200 feet for turbojets and from 3,900 to 11,300 feet for turbofans.)

The Town argues that Judge Dooling erred in concluding that the ordinance must be tested as if there were a set of ordinances each enacted by a bordering town, and taken all together enveloping the airport. Reliance is placed on the statement in Huron Portland Cement Co. v. Detroit, 362 U.S. 440, 448, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960) that the court would not consider the argument raised by the appellant there (who was contesting the constitutionality of a smoke abatement ordinance enacted by the City of Detroit as it applied to its vessels operating in interstate commerce) that different communities might enact smoke abatement ordinances with different standards, because the appellant had pointed to no such ordinances. The Town's analogy is false. The problem in this case is that Hempstead's ordinance would cause aircraft to fly over other towns, *not* that different towns might enact different noise ordinances. More important, there was no conflict between local and federal regulation in the *Huron* case; the problem there was undue burden on interstate commerce.

■ The Town also argues that *Cedarhurst* is irrelevant, because it regulated flight paths, while Hempstead's ordinance regulates noise. That ignores the essential point in the case, which is that some noise ordinances necessarily regulate flight paths, and the District Court found that Hempstead's is one of those.[4] In view of that finding, the injunction naturally followed. The order granting preliminary injunction is affirmed.

3. 199. The same calculations indicate that the vast majority of commercial jet aircraft could comply on take-off only by flying over the Town of Hempstead at much higher minimum altitudes (in the range 5,050 to 14,200 feet for turbojets and in the range 3,900 to 11,300 feet for turbofans).

4. In view of the conflict between the ordinance and the federal regulation we need not consider the questions of federal pre-emption, and undue burden on interstate commerce. In some situations, federal legislation and regulation is deemed so pervasive as to rule out all state and local attempts to regulate in the areas thus "pre-empted" by the federal government. See, e. g., Campbell v. Hussey, 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed. 2d 299 (1961). The area of flight patterns and procedures *may* be one of these; this court's opinion in the *Cedar-hurst* case implies that it is, where as the California Supreme Court's opinion in Loma Portal Civic Club v. American Airlines, Inc. says that it is not. See also City of Newark, New Jersey v. Eastern Airlines, Inc., 159 F.Supp. 750 (D.N.J.1958).

The third point involves the question whether the ordinance unduly burdens interstate commerce. If it was an undue burden on commerce for the State of Arizona to regulate the length of trains operating within the state, see Southern Pacific Co. v. State of Arizona, 325 U.S. 761, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945), it may be that this particular ordinance, found to regulate aircraft flight paths and procedures, is an undue burden on commerce. But the problem arises that it is this particular noise ordinance in this particular setting which is found to regulate flight paths and procedures; another noise ordinance might not have that effect.