**O. T. FREEMAN and Lucille Freeman,**
**Plaintiffs,**

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. No. 7930.**

United States District Court,
W. D. Oklahoma,
Civil Division.

Nov. 19, 1958.

Curtis P. Harris, Charles R. Nesbitt, Oklahoma City, Okl., for plaintiffs.

Paul W. Cress, U. S. Atty., George Camp, Asst. U. S. Atty., Oklahoma City, Okl., for defendant.

RIZLEY, District Judge.

This is an action against the United States founded upon the Fifth Amendment to the United States Constitution of which this court has jurisdiction under Title 28 U.S.C.A. § 1346. It is an action for the difference in the fair market value of plaintiffs' land before and after the alleged taking by the Government of two easements in reverse condemnation; one, a flowage easement of surface drainage waters, the other, an aviation easement for air flights over and above the land. Plaintiffs have waived all compensation in excess of $10,000 in order to come within the Tucker Act.

Judgment for defendant.

### Findings of Fact

This case having been heard by the Court upon the evidence, the Court makes the following specific findings of fact:—

1. Plaintiffs, O. T. Freeman and Lucille Freeman, his wife, are residents of the State of Oklahoma and are owners of the following described real property located in the Western District of Oklahoma:—

E½ SE¼ of Sec. 15, Township 2 North Range 20 West of the Indian Meridian, Jackson County, Okla., consisting of 80 acres more or less.

This property lies adjacent to the Altus Air Force Base—an installation of the U. S. Air Force—in a position south of the south end of the north-south runway, with the northeast corner of the property at a point one-fourth mile due west of the south end of the runway. Plain-

tiffs' house lies approximately ¾th miles distance from the runway in the southwest corner of the property.

2. The Altus Air Force Base is located three miles northeast of the City of Altus in Jackson County, Oklahoma. It has been in operation off and on since 1942. On March 21, 1955, the first jet aircraft was put into operation at this base. The plaintiffs owned and lived on their land prior to this time. While originally there were four short runways, these no longer exist and the primary instrument is one runway running north and south, 300 feet by 13,440 feet with overruns of 1,000 feet at either end. When landing from the north, it is runway No. 17, and when, from the south, it is runway No. 35, but both are on the same physical instrument.

3. Air traffic is controlled by G.C.A. traffic patterns, and during the last five years, at least, only the patterns directing traffic to the east of the airfield before landing and after takeoff have been used. This has been done to avoid flying over the City of Altus which lies to the southwest. The minimum safe glide angle for aircraft taking off and landing is 2.5 deg. and there is no difference in glide angle for different type aircraft. The direction and altitude of a normal flight after takeoff is a continuation of 170 degrees or 350 degrees bearing—depending on whether going north or south—for a distance of at least 8 miles before a turn. The altitude at that position is above 3,000 feet. For transition flying (practice landings and takeoffs) the aircraft remains on these headings for approximately three miles' distance from the base boundary, then turns east and has an altitude of 1,500 feet at that position. The proof is therefore that the glide path for a plane on takeoff or landing from the south end of the runway does not go over plaintiffs' land. All aircraft flown in the G.C.A. pattern are controlled so as to make a good track over the ground of all headings and to be under positive radar control at all times. Since this is a military base, control is strict and any deviation that would take

a plane over plaintiffs' land would be gross error on the part of the pilot thereof. No such deviations were ever reported to or noted by the officers in charge of the Air Force base, and they therefore were without knowledge of any such action if it did occur.

4. The Court concludes from all the proof that there may have been an occasional trespass over plaintiffs' property, but that they were not frequent or low flights of a recurring nature.

5. The natural drainage area into plaintiffs' land prior to the construction of the air base consisted of an area 97 acres in size lying immediately north of the property. After the construction of the base, and at the present time, the drainage area is 37 acres flowing towards plaintiffs' land. In addition to the diminution in the size of the drainage area, the Corps of Engineers at the time the base was built also constructed a concrete drainage ditch north of plaintiffs' property and parallel to their property line to carry the surface waters east to the northeast corner of their property, there to join another and larger bar ditch running parallel to the section road south to the creek that bisects plaintiffs' land. The north ditch and culvert were constructed to carry an estimated amount of water that might flow and this was computed on a 10-year frequency, or the largest amount of water which might foreseeably have to be carried at any one given time.

6. A portion of plaintiffs' land adjacent to the airfield was partially flooded in May, 1956 as the proof indicated. The proof also shows that in May, 1956 there occurred an unusual amount of rainfall for the month, but more specifically and damaging there occurred a 4-inch rain in a 30-minute period on the first of May that year. The same occurred again on the 18th of May, 1957. A 4-inch rain would be the equivalent of a 100-yr. frequency. These indicate an exceptionally heavy amount of rainfall during those periods of time, and amounts to almost what might be termed unprecedented rainfalls.

7. The natural drainage for the acreage north or above plaintiffs' land before the base was constructed was across plaintiffs' property to the creek.

## Opinion

The law to be applied in this case is now settled by the courts in Causby v. United States, 60 F.Supp. 751, 104 Ct.Cl. 342; United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206. The analysis therein was substantiated in Highland Park v. United States, Ct.Cl., 161 F.Supp. 597. Both parties to the present action rely on these two cases as the authority for their respective positions, feeling that the proof will meet the law as stated therein.

■■■ In United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206, Mr. Justice Douglas delivered for the first time the analysis of the problem before the Court. The Court cannot see any reason, nor has counsel raised any, for going further into the reasoning and analysis in that case. Justice Douglas said at page 264 of 328 U.S., at page 1067 of 66 S.Ct.:—

"The landowner owns at least as much of the space above the ground as he can occupy or use in connection with the land. * * * The fact that he does not occupy it in a physical sense—by the erection of buildings and the like—is not material."

This is an answer to the proposition that although the landowner today cannot own above his land to the reaches of the universe as under the old common law doctrine, he can own a certain portion of the air space and treat it as if it were part of the realty to the extent that it could be invaded or trespassed upon in the same manner as invasions of the surface. At page 266 of 328 U.S., at page 1068 of 66 S.Ct., Justice Douglas further states:—

"The airspace, apart from the immediate reaches above the land, is part of the public domain. We need not determine at this time what those precise limits are. Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land."

Therefore, it seems that each case will be determined by the facts and circumstances present in respect to whether or not the flights were frequent and at a low enough level to be the direct and immediate cause of a diminution in the value of the property involved. This diminution in value must at the same time result in a taking of property and not be a case of incidental damages arising from a legalized nuisance as was involved in Richards v. Washington Terminal Co., 233 U.S. 546, 34 S.Ct. 654, 58 L.Ed. 1088, or damages sustained by reason of noise, vibration, fear, anxiety, or nervousness resulting from planes operating near but not over plaintiff's land. These, oft-times called "proximity damages," are not recoverable. United States v. 26.07 Acres of Land, D.C.E.D. N.Y.1954, 126 F.Supp. 374.

■■ (1, 2) In the present case, the testimony by defendant's employees is conclusive that a plane could not have flown over the plaintiffs' land unless it had deviated from established procedures and patterns enough for the pilot to have been grossly in error; further, that this had never been known to have happened. From the location of plaintiffs' property to the runway, which property is not in the glide path at all, it is hard to see how a plane attempting to make any sort of a safe or proper landing could fly over plaintiffs' land. It is possible to see that they may seem closer than they actually are since they are the large and noisy B-47 jet bombers. In the testimony of Mr. Freeman, the plaintiff, there was some confusion and contradiction. On direct examination he stated that at least 12 planes flew over daily at about 200 feet, but on cross-examination he stated that there was probably only one plane every 24 hours and not that low. Further, he stated that his testimony given on direct was in error.

This was the only evidence plaintiff offered as to frequency and level of flights over his land. There was no specific damage to his land or appurtenances. The Court is therefore of the opinion that these facts are insufficient to prove an intentional taking of plaintiffs' property by the United States Government and so holds.

(3) As to the alleged taking of a drainage easement, the facts show that the natural drainage area flowing to the plaintiffs' land had been decreased in acreage substantially by the construction of the air base. They also show the efforts that were made by the Army Engineers to divert the waters around their land and to the creek that would have and did flow onto plaintiffs' land before the base was there. The Corps of Engineers determined the size of the culvert and ditch that should be built on the basis of frequency which took into consideration the size of the drainage area, the slope of the terrain, and the type of soil over which surface water had to flow. The construction was built on the basis of what rainfall could reasonably be expected even if hard rains occurred, but the evidence of flooding introduced by plaintiff covered the months of May in 1956 and 1957, the same months in which occurred the heaviest amounts of rainfall for short periods of time to have happened in several years in this area. The figures were taken from two rainfall reporting stations; one, two miles southwest of plaintiffs' land, and another, five miles northwest thereof, the closest true stations. The Court finds therefore that were it not for defendant's efforts to divert water that would naturally have crossed plaintiffs' land, the lands would have been more greatly flooded during those specified times. Therefore, this was not an intentional permanent taking of an individual's private property such as was found in Pumpelly v. Green Bay Co., 13 Wall. 166, 20 L.Ed. 557; United States v. Lynah, 188 U.S. 445, 23 S.Ct. 349, 47 L.Ed. 539; United States v. Welch, 217 U.S. 333, 30 S.Ct. 527, 54 L.Ed. 787.