## Pennsylvania Natural Weather Association v. Blue Ridge Weather Modification Association

*Clifford A. Weisel* and *Merrill W. Kerlin,* for plaintiff.

*Robert L. Frantz,* for defendant.

MACPHAIL, P. J., February 28, 1968.—In this action in equity, plaintiff seeks injunctive relief from the weather modification activities of defendants. Defendants admit that they are engaged in such activities.

Prior to the institution of this action, an appeal was taken to the Court of Common Pleas of Fulton County from a judgment by a justice of the peace against a defendant accused of violating a municipal ordinance of Ayr Township prohibiting weather modification activities in the township in that defendant operated a device known as a ground-based generator to emit silver iodide smoke into the air to suppress hail. By agreement of counsel, the case involving the appeal from the findings of the justice of the peace and the present case were consolidated for trial. The late Judge W. C. Sheely tried the cases without a jury. Requests for findings of fact were submitted and oral arguments heard by Judge Sheely. His subsequent illness and death occurred before any opinion was prepared or filed.

Although counsel would be entitled to a retrial under the circumstances (see Hyman v. Borock, 211 Pa. Su-

perior Ct. 126 (1967)), they have agreed that we may decide the case on the basis of the notes of testimony and the exhibits admitted at the trial. However, we did hear oral reargument on two occasions since the case has been before us.

Because we believe the issues raised in the two cases are somewhat different, we have elected to hand down separate opinions for each case.

While the implications of this case may be as far-reaching as counsel have indicated, the facts and the issues to be resolved are not too complicated.

Defendant, Wallace E. Howell Associates, Inc., contracted with defendant, Blue Ridge Weather Modification Association, in 1963 and 1964 to carry out a program of weather modification for the purpose of mitigating hail damage to crops within a prescribed "target area" which was principally located in the States of Maryland, West Virginia, Virginia and in Franklin County, Pa. Franklin County is contiguous to Fulton County. The eastern boundary of Fulton County and the southern one-half of the western boundary of Franklin County are identical. Fulton County was not within the prescribed "target area".

The hail mitigation program carried out by defendants involved two methods of operation. One method was the use of ground-based generators, one of which was located in Ayr Township, Fulton County, Pa. Ayr Township is situated in the southeastern portion of Fulton County and adjoins Franklin County. The type of ground-based generator used has a tank containing a solution of a double salt of silver and sodium iodide dissolved in acetone, about five percent of silver iodide by weight. The solution is sprayed into a propane gas flame where the acetone is burned and the silver iodide is vaporized. This "smoke" is then supposed to be carried upward into the clouds and downwind, away from the location of the ground-based generator. In the

clouds, the "smoke", or nucleant, is supposed to increase the concentration of ice-forming nuclei up to the range of 10 to 100 per liter, thereby increasing the number of hailstone "kernels" to the point where there is insufficient liquid super-cooled water for the growth of so many of these "kernels" to damaging size, while at the same time reducing the amount of liquid super-cooled water by conversion of a quantity of it to snow or slush. In principle, and considerably over-simplified, this is what is commonly known as "cloud seeding".

Defendants also employed airplanes in their hail mitigation program. The airplanes were equipped with two tubes, each tube being capable of carrying three flares containing a mixture of 10 grams of silver iodide which is emitted in the form of smoke when the flare is burning. The pilots fly the aircraft ahead and beneath the cloud level of an active thunderstorm so that the smoke of the flares becomes involved in the updraft within the storm. The pilots would fly back and forth under and, according to plaintiff's witnesses, sometimes into the clouds from the northern to the southern extent of the storm. There seems to be no dispute that they would and did fly over some portion of Fulton County for this purpose during the time period in question.

Fulton County's boundaries are generally formed, except on the south, by mountain ranges and most of the county lies in a wedged-shaped valley. It lies on the leeward side of Sideling Hill Mountain, a part of the Allegheny Mountains. Storms usually approach Fulton County from the southwest, west and northwest. The county is primarily a rural county with agriculture being its principal income-producing activity. It has only one borough and no cities.

During 1964 and 1965, Fulton County experienced a severe drought, which was not alleviated until 1967. While there is little doubt that the drought precipitated this suit, on the theory that the weather modification

activities of defendants was the cause or a substantial factor in causing the dissipation of clouds which would normally be expected to bring precipitation to Fulton County, the parties here are primarily interested in the determination of a broader issue. They want this court to determine the question of whether or not a landowner outside of the "target area" is entitled to weather in its natural form, even though defendants' activities were not intended to, and perhaps did not, in fact, affect the amount of rainfall Fulton County received or did not receive. To state it another way, does a landowner have a right to weather unmodified anywhere?

## FINDINGS OF FACT

1. Plaintiff Pennsylvania Natural Weather Association is a nonprofit Pennsylvania corporation, membership of which is composed of individuals, some of whom reside in Fulton County, Pa.

2. Defendant Blue Ridge Weather Modification Association is a nonprofit West Virginia corporation organized for the purpose of weather modification.

3. Defendant W. E. Howell Associates, Inc., is a corporation engaged in the business of cloud nucleation or weather modification.

4. Defendant Wallace E. Howell Associates, Inc. contracted with defendant Blue Ridge Weather Modification Association to carry out a program of weather modification for the purpose of mitigating hail damage to crops within a prescribed "target area". Fulton County, Pa. was not within the "target area" at any time but weather modification activities did occur there. The periods of time covered by the contract between defendants were the months of May through August, 1963, and the months of May through August, 1964.

5. There was no contract between defendants to carry out a weather modification program in 1965. Defendant Howell performed no weather modification

activities within the "target area" or in Fulton County, Pa., during the year 1965. There were no weather modification activities contracted for by the Blue Ridge Modification Association during the year 1965.

6. The hail mitigation program carried out by defendants involved the use of two airplanes and approxicately 110 ground-based generators. The ground-based generators were placed at locations approximately one-half hour upwind from the "target area" and at locations within the "target area", which would be approximately one-half hour upwind from the orchards to be protected. The type of ground-based generator used by defendant Howell in its hail mitigation program has a tank containing a solution of a double salt of silver and sodium iodide dissolved in acetone, about five percent of silver iodide by weight. The solution is sprayed into a propane gas flame where the acetone is burned and the silver iodide is vaporized. The airplanes operated by defendant Howell were a single engine North American T28 located at Martinsburg, W. Va., and a single engine North American AT6 based at Cumberland, Md. Both airplanes were equipped with two tubes, each tube being capable of carrying three flares similar in general composition to a highway warning flare, but containing in its mixture 10 grams of silver iodide which is emitted in the form of smoke when the flare is burning. Each flare burns at a rated 20 minutes. Three flares in succession would burn for a duration of approximately one hour.

7. The technique to be used by the pilots of defendant Howell in seeding potential hail clouds was to fly the aircraft ahead of and beneath the cloud level of an active thunderstorm so that the smoke produced by the burning flare or flares became involved in the updraft within the storm. If, as is usually the case in the area of Fulton County and the target area, the thunderstorm is traveling in a northeasterly, easterly or south-

easterly direction, the pilot would fly back and forth from the northern to the southern extent of the storm.

8. The principle of cloud seeding for hail mitigation is to increase the concentration of ice-forming nuclei up to the range of 10 to 100 per liter and thereby to increase the number of hailstone kernels to the point where there is insufficient liquid super-cooled water for growth of so many to damaging size while at the same time reducing the amount of liquid super-cooled water by conversion of a quantity of it to snow.

9. Fulton County is part of a widespread region extending from Maine to Virginia, which has experienced severe drought for a period of over 51 months. This drought became increasingly severe in 1964 and 1965. The drought area includes Fulton County.

10. During the summers of 1963 and 1964, numerous and various property owners and residents of Fulton County, Pa., observed changes or modifications in cloud formation in Fulton County, Pa., at the same time as they observed aircraft activity in the vicinity of clouds of the same color and character as would normally bring precipitation to the area.

11. The dissipation of clouds seen by residents of Fulton County is typical of what happens along the lee side of mountains under drought conditions, and this unusual problem of atmospheric circulation could explain what was observed.

12. Dr. Wallace E. Howell, president of defendant Howell, in the opinion of fellow scientists and meteorologists in that field, is regarded as one of the most responsible of those who are experimenting and operating in the cloud seeding field. The principles and equipment used by defendant Howell in its cloud seeding activities were, in general, the same type that are used by governmental agencies in conducting similar operations. Defendant Howell follows recognized scientific principles in its commercial cloud seeding operation.

The operations, techniques and practices of defendant Howell in its hail mitigation operations in the area of Fulton County and vicinity have conformed to the standards of professional commercial cloud seeding operations as they are conducted throughout the United States.

13. Over a span of many years, the possibility of hail mitigation by cloud seeding has been under review by panels of distinguished meteorologists. Individuals on these panels have expressed a wide range of opinion on the efficacy of current hail mitigation procedures, ranging from cautious optimism to warnings of conceivable adverse effects under some conditions.

14. There is a great deal of unpredictability about the weather even in its natural form.

15. Cloud seeding would probably modify or change the number and distribution of raindrops.

16. The results of cloud seeding are unpredictable.

17. It cannot be proved or disproved that the same quantity or quality of precipitation falls at the same place in the event of cloud seeding.

## DISCUSSION

Discussions of "individual rights" these days are largely restricted to individual freedoms. The courts have uniformly held that in such areas the rights of the individual are paramount to those of society. Should the same rule apply to an individual's property rights; specifically, his right in his real property? What are those rights?

The principal natural rights attendant to and inherent in the ownership of land are: (1) riparian rights; (2) the right to support of land, both lateral and subjacent; (3) the right to natural diffusion of the air reasonably free from dust, smoke or other pollution; (4) the right to natural drainage of the land; and (5) the right to use the land for any reasonable purpose such as farming, quarrying or residence. In addition,

there is a general right in a landowner freely to enjoy the use of his land in its natural condition without interference by his neighbors: 3 Tiffany, §714 (3rd. ed.). The right to use land without the right to use it in its natural condition is valueless.

It seems to us that one of the elements of land in its "natural condition" must be weather in its natural form, including all forms of natural precipitation. To hold otherwise would make a mockery of real estate acquisitions. For example, suppose A buys Blackacre which has been a productive orchard for years. After reasonable investigation, he is satisfied that the weather in the area, subject to normal and *natural* deviation, is conducive to productive orchards. After he buys Blackacre, B, who owns Whiteacre 25 miles distant, engages in weather modification activities to divert some portion of the rainfall A would normally receive for his own benefit. Depending upon the success of the modification activities, this could have little effect or a disastrous effect upon Blackacre. Conceivably, B could take all of the moisture and Blackacre would be valueless. True, this same situation might come about by natural means, but A's risk in this respect is one he assumes when he acquires his real estate. He does not assume the risk of weather modification activities by neighbors.

If we conclude that weather in its natural form is a natural incident of land ownership, it also follows that we must conclude that a landowner has some "right" in the clouds, or more specifically, in the moisture in the clouds. It has been observed that rights in clouds have not been determined thus far simply because problems concerning them did not arise. See "Who Owns The Clouds?", 1 Stanford Law Review 43.

In the case of Slutsky v. City of New York, 97 N. Y. S. 2d 238 (1950), the owners of a resort area sought injunctive relief from the City of New York, which was seeding clouds to make it rain in order to

relieve a shortage in the water supply of New York City. The resort was very unhappy because the rain or the threat of rain would adversely affect their business which was based upon fair weather. The court, in refusing the injunction, was obviously persuaded by the relative equities in the case, i.e., the interest of a small resort compared with the interest of what was then the nation's largest city. However, the court did say, page 239:

"Apart from the legal defects in plaintiffs' suit *(since they clearly have no vested property rights in the clouds or the moisture therein)*, the factual situation fails to demonstrate any possible irreparable injury to plaintiffs". (Italics supplied).

The court's language concerning vested property rights in clouds and moisture was dicta, unsupported by legal authority or reason and was not favorably received. See 34 Marquette Law Review 262.

In the so-called Southwest Weather Research Cases, Southwest Weather Research, Inc. v. Jones, 320 S. W. 2d 211, and Southwest Weather Research, Inc. v. Duncan, 319 S. W. 2d 940, which were consolidated and affirmed at 160 Texas 104, 327 S. W. 2d 417 (1959), the trial court granted a preliminary injunction enjoining defendant from engaging in weather modification activities. The injunction was modified in an intermediate court to apply only to those cloud seeding activities which "directly" affected plaintiff's land. The appellate court, in affirming the grant of the temporary injunctions as modified, observed that "These causes involve complicated scientific problems, as well as the legal determination of the property rights of both the landowners on one hand and those engaged in a business enterprise on the other": 160 Texas 110.

However, the court pointed out that these matters would be determined initially by the trial court when there were further proceedings in the case, since they

were only upholding the lower court's decision that there was sufficient harm or threat of harm to warrant the preliminary injunction. Unfortunately, no further proceedings are reported and the legal determination of those property rights remains unknown.

To the best of our knowledge, and after extensive research, the New York case and the Southwest Weather Research Cases are the only reported cases which have touched upon the subject now at hand. The New York case has stated categorically that there are no vested property rights in the clouds or the moisture therein, while the Southwest Weather Research Cases made no determination of the property rights in moisture in the clouds.

The Aeronautical Code of Pennsylvania of May 25, 1933, P. L. 1001, 2 PS §1460, et seq., in section 401, 2 PS §1467, states as follows:

"The ownership of the space over and above the lands and waters of this Commonwealth is declared to be vested in the owner of the surface beneath, but such ownership extends only so far as is necessary to the enjoyment of the use of the surface without interference, and is subject to the right of passage or flight of aircraft . . ."

There can be no doubt that the legislature, by this enactment, was plainly concerned with the "free flight" of aircraft, but the language is not inconsistent with the accepted statements of the general property rights of a landowner including his right to use "space" without interference and that he "owns" whatever he has to "own" to make such use possible. "When it is said that man owns, or may own, to the heavens, that merely means that no one can acquire a right to the space above him that will limit him in whatever use he can make of it as a part of his enjoyment of the land. To this extent his title to the air is paramount. No other person can acquire any title or exclusive right to any space

above him": Hinman v. Pacific Air Transport, 84 F. 2d 755, 758 (1936).

To state it another way, the landowner has a right not to have the air space used to his detriment except as is reasonably necessary for aircraft flights: United States v. Causby, 328 U. S. 256 (1946). Thus, the recognition of property rights in "space" is not unknown to the law.

Nor is it unknown to the law to hold people responsible who contaminate the air and cause injury or harm to people "down-wind". In Heck v. Beryllium Corporation, 424 Pa. 140 (1966), a jury had rendered a verdict for plaintiff in an action of trespass. Plaintiff claimed damages from defendant, alleging that defendant, a manufacturer of beryllium, emitted beryllium into the atmosphere. Plaintiff resided within several miles of the factory and contracted a disease caused by the inhalation of beryllium. This was not an occupational disease but was caused by the toxic gases being wafted in the direction of plaintiff's residence by the natural flow of air. The trial court granted defendant's motion for judgment n. o. v. and the Supreme Court reversed and remanded the case to the trial court for a new trial. Citing section 289 of the Restatement of Torts 2d, Comment J, the Supreme Court held that once defendant became aware of the toxicity level which was unsafe, thereafter any emissions in excess of that level would constitute negligence. Apparently neither the trial court nor the jury had any trouble with causation.

We are of the opinion that clouds and the moisture in the clouds, like air and sunshine, are part of space and are common property belonging to everyone who will benefit from what occurs naturally in those clouds. There could be just as much injury or harm from weather modification activities as there could be from air and water pollution activities. We hold specifically that every landowner has a property right in the clouds

and the water in them. No individual has the right to determine for himself what his needs are and produce those needs by artificial means to the prejudice and detriment of his neighbors. However, we feel that this cannot be an unqualified right. Weather modification takes many forms and produces, or appears to produce, desirable effects. For example, there is fog suppression, lightning suppression and hail suppression. In addition, cloud seeding has been used and will continue to be used to produce rain to relieve the water shortage in our urban areas. We feel then that weather modification activities undertaken in the public interest, as opposed to private interests, and under the direction and control of governmental authority should and must be permitted.

While we might easily become involved in legal and scientific theory in a case such as this, we must not lose sight of the fundamental principles of equity which are completely binding upon us in this proceeding. Plaintiffs not only must show that defendants actually engaged in weather modification, but must also show that they were injured thereby. There is no doubt that defendants did engage in the activities, but there is considerable doubt in our minds that plaintiffs proved that they were injured thereby. "The fact that a thing may possibly work injury to somebody is no ground for an injunction. The drastic remedy of injunction will not be granted except upon clear and convincing evidence of an intended or threatened injury, which must be actually threatened and not merely anticipated, and must be practically certain and not merely probable. If the injury is doubtful, eventual, or contingent, equity will not grant this relief. In other words, injunction will not issue to allay mere fears and apprehension as to future damages": 8 Standard Pa. Prac., §418.

There is evidence in this case which indicates "possible" harm. The report of the special commission on

weather modification of the National Science Foundation dated December 20, 1965, indicates, at pages 18 and 19, the dramatic effect weather or climate modification could have upon man's ecosystems. The conclusion reached was that "one can roughly predict that the biological outcomes of weather modification are apt to be a mixed bag of economically good and bad effects in man's artificial ecosystems". Dr. Reichelderfer, the expert witness used by agreement by both parties in this case, stated that there was such a thing as "over seeding" clouds and that if this was done the net effect would be to reduce precipitation. Since the trial of the case, the first interim report of the Bureau of Reclamation, Office of Atmospheric Water Resources, was published, October 1967, and it states, pages 24 and 28, that "Seeding efforts commonly use solutions of silver iodide and acetone; other artificial nucleants include lead diiodide, sodium iodide, potassium iodide, metaldehyde, phloroglucinal, 1, 5 dihydroxynaphhalene, isopropylamine and urea. To varying extents, the components or the combinations of these chemicals *are poisonous* . . . The scientist's defense here is the extreme dilution of the nucleant as a safety factor. Whether there will be an ecological reconcentration of the nucleant in the water through various biological and natural processes, is not known, though . . . it is discussed". (Italics supplied.)

It is obvious to us that possible harm can result from uncontrolled and unregulated weather modification activities. Irresponsible people engaged in such activities could produce a wholly undesirable and serious situation. The reports indicate that there are troublesome and serious areas of concern involved. Recently, a Catholic priest, Father McKenzie, wrote that "men are not God, and they do not succeed well when they attempt to play God". In a sense, by weather and climate modification activities, man is trying to superimpose his

judgment of what is right and necessary upon the judgment of the Creator and it is indeed questionable whether he will succeed very well.

However, the question still remains of whether or not plaintiff here has actually suffered damage or if the threat of such damage is imminent. No particular witness for plaintiff was able to relate the activities of defendants to damage suffered by him. That there was a drought in the entire area is not disputed, but the drought began before, and continued after, the weather modification activities complained of here. Nowhere in the record is there any evidence of "over seeding" clouds by defendants to reduce precipitation. In fact, defendant's evidence is to the effect that the hail suppression increased precipitation.

In summary, on this point plaintiffs simply have not shown us more than the *possibility* of future harm rather than the certainty of it which equity rules require before injunctive relief can be given.

The other burden plaintiff must bear is proof that there is no adequate remedy at law. Since the trial of the instant case, the General Assembly of the Commonwealth of Pennsylvania enacted the Act of November 9, 1965, P. L. 677, 18 PS §3871, et seq., which made it a misdemeanor for anyone to "install, construct, erect, operate or maintain any equipment, machinery, airplane or device within the Commonwealth designed to or intended to, eliminate, regulate or interfere with the normal rainfall or precipitation, or engage in rain making, cloud seeding, hail dispersement or hail chasing, or maintain or operate any equipment or devices known as ground-based generators used in conection with rain making, cloud seeding, hail dispersement or hail chasing whereby chemical, smoke, or vapors are discharged into the atmosphere for the purpose of or which tend to affect the normal precipitation or rainfall" in those counties where the county commissioners enact a reso-

lution stating that such actions are detrimental to the welfare of the county. Were that statute to remain on the books, there could be no question that plaintiffs would have an adequate remedy at law as of the effective date of the statute, assuming that the Fulton County Commissioners enacted a proper resolution.

However, the 1965 statute was specifically repealed by House Bill No. 1113, which was passed by the General Assembly of the Commonwealth of Pennsylvania prior to its adjournment in 1967 and signed into law by Governor Shafer on January 19, 1968, as Act No. 449. This new act provides, inter alia, for a "Weather Modification Board", requires the licensing of those persons engaged in weather modification activities in the State, specifically states that as a matter of State policy scientific experimentation in the field of artificial nucleation should be "encouraged" and, most importantly, for the case before us, specifically provides for damage compensation to property owners: Section 14. In short, any future damage to plaintiff has now been provided for in this State.

Finally, we have, in an opinion of even date herewith, sustained the validity of the Ayr Township ordinance which prohibits weather modification activities.

CONCLUSIONS OF LAW

1. Moisture in the clouds is common property belonging to everyone who will benefit from what occurs naturally in the clouds.

2. Every owner of land has a property right in the moisture in the clouds and the right to receive that moisture in its natural form subject to such weather modification activities as shall be carried out by governmental authorities in the public, as opposed to private, interest.

3. The activities of defendants are lawful and do not constitute a nuisance.

4. There is no threat of immediate and irreparable

harm to plaintiff as a result of defendants' activities.

5. The burden is on plaintiff to show damage or that damage will result as a certainty from defendants' activities.

6. Plaintiff now has an adequate remedy at law and the issue raised by this case is moot in Pennsylvania.

### DECREE NISI

And now, February 28, 1968, in conformity with the foregoing, it is ordered and directed that:

1. The complaint be dismissed.

2. The costs be paid by plaintiff. Since this case was joined for trial with September term, 1964, no. 53, in which case we entered an order in favor of Ayr Township, it would seem to be equitable to have one-half the costs of trial paid by defendant David L. Fulk and the other one-half to be paid by Pennsylvania Natural Weather Association. All other costs should be paid by the parties responsible therefor under the usual rules.

This adjudication shall become a part of the record of this case and the prothonotary shall give prompt notice of the filing of the same to the parties; unless exceptions are filed within 20 days after such notice, this decree shall be entered as of course by the prothonotary as a final decree.